UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| MELISSA HIGGINS, | ) | Civil Action No.: 4:06-3501-RBH-TER |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| | ) | |
| BRUCE FARMER and | ) | |
| BURROUGHS & CHAPIN, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## I.     INTRODUCTION

This is an employment discrimination case pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. and for various state law tort claims.  The Plaintiff alleges causes of action against Burroughs & Chapin, Inc., her former employer, for: sexual harassment / discrimination in violation of Title VII, retaliation in violation of Title VII, negligence including negligent retention / supervision, and defamation.  (Second  Am. Comp. (Document # 85).  The Plaintiff alleges causes of action against Bruce Farmer, her former supervisor, for: assault, battery, intentional infliction of emotional distress,[1] defamation, and interference with contract.[2]  Id. Presently before the Court is Defendant's Motion for Summary Judgment (Document # 70).  The Plaintiff filed a Response in Opposition to Summary Judgment (Document # 80); the Defendants

_____

[1] Plaintiff had alleged a claim against Burroughs & Chapin for intentional infliction of emotional distress.  Defendant noted that Plaintiff agreed to dismiss that claim, and Plaintiff agreed in her Opposition to Summary Judgment not to pursue it.  See Document # 80 at n.74.

[2] Plaintiff had alleged a claim against Farmer for negligence / gross negligence.  In response to the Defendants' Motion for Summary Judgment, the Plaintiff agreed to dismiss this claim.

filed a Reply (Document # 88); and the Plaintiff a Sur-Reply to the Reply (Document # 89).  All

pretrial proceedings in this case were referred to the undersigned pursuant to the provisions of 28

U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(g), DSC.  Because this is a dispositive

motion, this report and recommendation is entered for review by the district judge.

## II.    FACTUAL HISTORY

### A. Alleged Sexual Harassment by Farmer Prior to the Hotline Telephone Call

Burroughs & Chapin ("B&C") hired Plaintiff in June 2000 as an assistant in the human

resources department. (Pl. Dep. at 122 (Pl's Exh. 3)).  Plaintiff applied for a purchasing assistant

position in the purchasing department in December 2000 or January 2001.  (Pl. Dep. At 136 (Def's

Exh. B)).  Bruce Farmer, employed in the purchasing department, interviewed Plaintiff.  When

Plaintiff told HR that she had accepted a different position at B&C, "they made her leave right then."

Id. at 125.  She did not work for two weeks.  Id.  Plaintiff began her job as purchasing assistant on

January 29, 2001. (Pl. Dep. at 147-48 (Pl's Exh. 3); (Pl's Exh. 35).  Plaintiff reported to Defendant

Bruce Farmer, Burroughs & Chapin's director of purchasing until mid-February 2005. (Pl. Aff. ¶ 2

(Pl's Exh. 12).[3]

### 1. 2001

--------

[3] After Plaintiff's deposition, she created an affidavit.  The affidavit is not dated.  Defendants object to the affidavit to the extent that it consists of conjecture, speculation, or inadmissible hearsay. See Defendants' Reply at 4 n.6.  Defendants further object to the affidavit on the ground that the statements conflict with her deposition testimony.  See Defendants' Reply at 4-5.  The court has reviewed the deposition testimony submitted by Plaintiff and Defendants and Plaintiff's subsequent affidavit.  The court finds that Plaintiff's affidavit is not in such conflict with the deposition testimony that the affidavit should be disregarded as a sham issue of fact.  Cf. Rohrbough v. Wyeth Lab. Inc., 916 F2d 970, 974 (4th Cir. 1990).  The court will rely on Plaintiff's affidavit to the extent that the facts are not conjecture, speculation, or inadmissible hearsay.

A couple of months after Plaintiff began working in purchasing, Farmer touched the Plaintiff's hand for maybe four seconds to admire her ring. (Pl. Dep. at 183 (Pl's Exh. 3)). Although Plaintiff found the touching offensive, Plaintiff brushed it off thinking that Farmer did not mean anything by it. (Pl. Dep. at 185-87 (Pl's Exh. 3)). At the beginning of 2001, Farmer told Plaintiff that she looked like she could be a stripper. (Pl. Dep. at 186 (Pl's Exh. 3)). When Plaintiff became upset, Farmer explained: "Oh, I mean one of the nice strip clubs, not one of the sleazy ones. There are strip clubs where the girls are beautiful." (Pl. Dep. at 187 (Pl's Exh. 3)). In 2001, Farmer called Plaintiff into his office, shut the door, and hugged her for a few seconds and said words to the effect of "you are doing a really good job, I'm proud of you." (Pl. Dep. at 189-91 (Pl's Exh. 3)). Plaintiff complained to a co-worker in purchasing, Terrie Moore, who then advised Farmer that Plaintiff was bothered by his action. Id. The next day, Farmer called Plaintiff into his office to discuss the incident. Plaintiff told Farmer that his conduct was unwelcome, and Farmer replied that he thought of Plaintiff as a daughter and that he did not sexually harass her. Id. at 192-94. Farmer told Plaintiff that he would never go down for sexual harassment. Id. Plaintiff understood this to be a warning to her to not say anything to anyone. Id. at 200.

In 2001, about three times a week, Farmer leaned over Plaintiff at her desk and his chest area would touch her back. Id. at 195. Also, Farmer told about three dirty jokes in 2001 and he would state that he liked a woman's breasts or the shape of her body. Id. at 196-97 ; see also id. at 405-06 (stating that comments about women's bodies occurred approximately a dozen times). During 2001, Farmer touched the Plaintiff's hands and arms about three times per week. Id. at 201. In 2001, Plaintiff did not complain to human resources about Farmer's conduct because she was afraid of him due to his warning to her and because he controlled her raises and reviews. Id. at 200-02. Plaintiff

-3-

also thought she could handle it and maybe make him stop by pulling away from Farmer and by trying to avoid him.  <u>Id.</u> at 203.  Plaintiff stated that Farmer's touchings did not hurt and did not make her miss any work.  <u>Id.</u> at 210, 216.

The record reveals several instances of unwelcome conduct that is not dated.  For example, Farmer frequently commented to Plaintiff that he found her to be attractive and that her outfits accentuated her body.  (Pl. Aff. ¶ 3 (Pl's Exh. 12).  On one occasion in 2003, Farmer told the Plaintiff that she had nice curves.  <u>Id.</u>  Farmer told Plaintiff on many occasions that she had nice lips and he could hardly refrain from kissing them.  <u>Id.</u>  On numerous occasions, Farmer would tell Plaintiff how lucky her husband was to have her.  <u>Id.</u>  Farmer also touched Plaintiff's hair two or three times and told her how pretty it looked.  (Pl. Dep. at 406 (Pl's Exh. 3)).  On more than one occasion, Farmer told Ridge, Plaintiff's co-worker, that he could see her bra and panties, and once he described to her the underwear that she was wearing.  (Ridge Aff. at ¶ 5 (Pl's Exh. 1)).  Farmer repeatedly told Ridge how "pretty" she was and commented on how her clothes looked on her.  <u>Id.</u>  Farmer also told Ridge that she was attractive and her husband was lucky to have her.  <u>Id.</u>  Farmer would tell Plaintiff and Ridge that they were lucky to have their jobs, that they were lucky to make the money he paid them because they did not have college educations, that they would never have a boss as good as him, and that other employers would never hire them. (Pl. Dep. at 406-07, 409, 410 (Pl's Exh. 3)); (Ridge Dep. at 207-09 (Pl's Exh. 2)).

### 2. 2002

Plaintiff testified that, in 2002, Farmer "constantly was behind me, touching me, rubbing my shoulders. He would call me, again, into his office and hug me." (Pl. Dep. at 211-12 (Pl's Exh. 3)). Plaintiff estimates that in 2002 she was hugged by Farmer on less than eight to ten, but more than

six, occasions.  Id.  "[H]e would start out a normal hug, and then he got to where he would rub down to my butt area."  Id. at 213; see also id. at 218 (during the hugs in 2002 Farmer would squeeze Plaintiff, rub down towards her butt and touch it, and Plaintiff would have to pull away from him). Regina Berg testified that in 2002 she witnessed an incident where Farmer "put his hands on [Plaintiff's] waist as he went by her." (Berg Dep. at 67 (Def's Exh. G)).  Berg recalled that Farmer had his hands on Plaintiff's waist for "[p]robably two seconds."  Id. at 68.  Berg later told Plaintiff "he should not ever touch you like that ... that's like sexual harassment."  Id.  Plaintiff did not complain to anyone about Farmer's conduct because she was afraid she could lose her job due to Farmer's previous threat that he would never go down for sexual harassment.  (Pl. Dep. at 220 (Pl's Exh. 3)).

### 3. 2003

In 2003, Plaintiff stated that Farmer's unwanted touchings and conduct continued.  (Pl. Aff. ¶ 4 (Pl's Exh. 12); see also (Pl. Dep. at 335 (Pl's Exh. 3) (recounting 2003 incident where Farmer snapped Plaintiff's bra strap)).  In 2003, Jamie Ridge was hired as a purchasing assistant, the same position that Plaintiff had held, and Ridge shared an office with Plaintiff.  (Pl. Dep. at 156-57, 266). Plaintiff and Ridge were acquaintances from church.  Ridge telephoned Plaintiff at home to discuss the purchasing assistant position and during the one hour conversation Plaintiff did not tell Ridge how it was to work with Farmer.  Id. at 261-265.  For the first couple months that Ridge worked in purchasing, Farmer did not bother her.  Then, Farmer began unwanted touching by leaning over Ridge, rubbing her shoulders, and touching her hand.  (Ridge Dep. at 176-79 (Pl's Exh. 2)).  By the end of 2003, Farmer had touched Ridge more than a dozen times.  (Ridge Dep. At 179) (Pl's Exh.2)).

-5-

On or about June 11, 2003, Farmer called Plaintiff into his office and told her that she and Ridge looked stupid together, that due to her hair color, the way she looked and her age, senior staff was calling Plaintiff and Ridge "dumb blonde bimbos."  (Pl. Dep. at 323 (Pl's Exh. 3)).  Ridge recalled that Farmer stated that senior management talked about Ridge and Plaintiff in their morning meetings, how stupid they looked together, and called them "dumb blonde bimbos."  (Ridge Dep. at 166 (Pl's Exh. 2)).  The next day, Plaintiff and Ridge in person verbally reported Farmer's comments to Farmer's supervisor, CFO Barry Spivey.  They complained to Spivey about Farmer's unwanted touchings, Farmer's propensity to get up close to them, and his "dumb blonde bimbos" and "look stupid" comments.  (Pl. Dep. at 323-28 (Pl's Exh. 3)); (Ridge Dep. at 166 (Pl's Exh. 2)).  Spivey told Plaintiff and Ridge that B&C did not discriminate against women and that they had a vice-president who was a woman.  (Pl. Dep. at 327 (Pl's Exh. 3)).  Spivey told the Plaintiff and Ridge that he would speak to Farmer if they requested, which they did.  Id.  Farmer nor Spivey mentioned anything again to Plaintiff about her June 12, 2003, complaint.  Id. at 328.  Farmer never called Plaintiff a bimbo again nor said she looked stupid.  Id.  HR representative Amanda Broderick recalls Plaintiff and Higgins complaining about being called bimbos and Broderick passed this on to her immediate boss, Tara Little, as well as to the senior vice president for human resources, Mary Basden.  (Broderick Dep. at 28-30 (Pl's Exh. 4)). Basden told Broderick to speak to Plaintiff and Ridge about the manner in which they dressed. (Broderick Dep. at 29- 31 (Pl's Exh. 4)). The only evidence is that Plaintiff and Ridge dressed appropriately for the workplace.  (Broderick Dep. at 33 (Pl's Exh. 4)); (Farmer Dep. at 172 (Pl's Exh. 5)).

### 4. 2004

In 2004, Farmer began making comments to both Plaintiff and Ridge that they considered to be "vulgar." For example, Farmer told a story related to his son getting beat up and the size of a boy's "dick" and Farmer demonstrated the size of his penis, exclaiming "it's this big, do you see me?, it's this big." (Ridge Dep. at 190-91 (Pl's Exh. 2)); (Pl Dep. At 329) (Pl's Exh. 3); (Pl. Aff. ¶ 5 (Pl's Exh. 12)). Farmer also picked up a model Ford wooden wagon that Plaintiff had on top of her computer and stated to Ridge and Plaintiff "I get a woody every day. Did you hear me? I said, I get a woody every day, if you know what I mean." (Ridge Dep. at 190 (Pl's Exh. 2)).

Jim Scales joined the purchasing department in 2004. (Scales Dep. at 23 (Pl's Exh. 6)). Farmer told Scales that Plaintiff and Ridge had reported his comments to Spivey and that they were trying to "stir the pot, stir things up" and "not be a team." (Scales Dep. at 21 (Pl's Exh. 6)). Scales testified: "There were numerous occasions when I first got there [Farmer] referred to them as the blonde bimbos. He would tell me that they weren't smart enough to do things on their own. They had to do things together. " (Scales Dep. at 19, 23 (Pl's Exh. 6)). Another purchasing agent, Regena Berg, also confirmed that she heard Farmer refer to Plaintiff and Ridge as blonde bimbos. (Berg Dep. at 115-16 (Pl's Exh. 8)). After the 2004 Super Bowl, at the staff meeting Farmer discussed for about five minutes Janet Jackson's breast, her nipple ring, how it took up her whole nipple, how it jiggled, how she had nice boobs. (Pl. Dep.at 330 (Pl's Exh. 3)); (Ridge Dep. at 196-97, 199-200 (Pl's Exh.2 )); (Berg Dep. at 140 (Pl's Exh. 8)). In March of 2004, Farmer called Plaintiff on her cellular phone while she was out collecting checks for the March of Dimes. Farmer asked her to go to his house, clean it, cook him dinner, run him a bath, play music, turn the temperature down just right, and maybe he would let her go home. (Pl. Dep. at 330-32 (Pl's Exh. 3)); (Pl's Exh. 9). Farmer told the Plaintiff that would be ultimate job security. Id. In April 2004, Plaintiff, Ridge, and Farmer attended

a blood borne pathogen meeting during which Farmer asked Plaintiff and Ridge if their husbands used condoms during sex because it was dirty. (Pl. Dep. at 332-33 (Pl's Exh. 3)); (Pl's Exh. 9); (Ridge Aff. ¶ 3 (Pl's Exh. 1)).

In 2004, Farmer told Plaintiff about rumored sexual escapades of other employees. (Pl. Dep. at 333 (Pl's Exh. 3)).  In late 2004, Farmer told Plaintiff sexual stories, including a story of him making out with another employee, who was simulating having sex with Farmer in a bar after the 2004 Christmas party (Pl. Dep. at 334 (Pl's Exh. 3)), and about an incident in which a teenage prostitute, who was in his car, offered him a "blow job." (Pl. Dep. at 334 (Pl's Exh. 3)); (Ridge Dep. at 194-95 (Pl's Exh. 2)); (Scales Dep. at 8-11 (Pl's Exh. 6)).  Plaintiff stated that Farmer touched her approximately every other day in 2004. (Pl. Dep. at 340-41 (Pl's Exh. 3)).

### B. Hotline Telephone Call on 2-7-2005 and the Resulting Investigation

In February 2005, B&C implemented an anonymous 800 hotline for employees to call a third party to report employee issues and concerns.  (Basden Dep. at 43-44 (Pl's Exh. 13)); (Wendel Dep. at 13-14 (Pl's Exh. 14)).  In a meeting, Farmer stated to employees that the hotline was not for such matters as sexual harassment. (Pl. Aff. ¶ 8 (Pl's Exh. 12).  Berg testified that Farmer said the whistle blower thing was not for people who commit sexual harassment and that he was protected.  (Berg Dep. At 93 (Pl's Exh. 8)).  Soon after the hotline was began, Scales called the hotline to report Farmer's conduct towards Plaintiff and Ridge.  (Scales Dep. at 87-88 (Pl's Exh. 6)); (Berg Dep. at 92-93 (Pl's Exh. 8)).  Scales reported the conduct without telling Plaintiff and Ridge that he would do so; he advised them soon thereafter that he had reported Farmer's conduct so that they would be prepared to answer questions.  (Scales Dep. at 87 (Pl's Exh. 6)).

Due to the hotline call, Mary Basden, vice president of human resources, conducted an investigation. (Little Dep. at 16-17 (Pl's Exh. 15)). Basden interviewed Plaintiff, Ridge, Berg, Scales, Diane Movsky (an employee from another department), and Farmer. (Basden Dep. at 124 (Pl's Exh. 13)); (Report of Investigation (Pl's Exh. 16)). Plaintiff and Ridge told Basden about Farmer's unwelcome touchings, sexual comments, and his threats that he was untouchable. (Report of Investigation (Pl's Exh. 16)). Basden felt that Plaintiff and Ridge were being truthful. (Basden Dep. at 86-87 (Pl's Exh. 13)). Basden told Ridge that Farmer probably did not mean it or did not realize what he was doing, and that she would hate to see Farmer lose his job over something like this. (Ridge Dep. at 204-05 (Pl's Exh. 2)). Plaintiff and Ridge provided Basden with a list of examples of Farmer's conduct. (Pl's Exh. 9); (Ridge Dep. at 227-28 (Pl's Exh. 2)); (Basden Dep. at 90 (Exh. 13)).

Farmer let his subordinates know that he was being investigated and that he had been reported for sexual harassment. (Berg Dep. at 90-91 (Pl's Exh. 8)). Farmer told Scales that because of his connections the most he would get is a slap on his hands. (Scales Dep. at 28 (Pl's Exh. 6)). In fact, before the hotline call, Farmer had told Scales and Berg that he had protection and did not have to worry. Id. at 12. Berg corroborated Farmer's conduct during her interview with Basden. (Pl's Exh. 16). Basden questioned Scales as to whether he was the anonymous hotline caller, and he falsely denied it. (Scales Dep. at 6 (Pl's Exh. 6)). During his interview with Basden, Scales corroborated Farmer's conduct and that Farmer told employees that he would not face any consequences for sexual harassment. (Pl's Exh.16). Basden also interviewed an employee, Diane Movsky, who was a friend of Farmer and did not recall working in close proximity to the purchasing department. (Movsky Dep. at 17-18 (Pl's Exh. 17)). Movsky told Basden that Farmer would make

comments like "you look hot today" or "I dreamed about you last night." (Pl's Exh. 16). Movsky stated that Farmer was joking and it did not bother her but she understood how his comments could be taken the wrong way and construed as "creepy" by younger females. Id. Movsky does not recall Basden asking her any questions about Plaintiff or Ridge. (Movsky Dep. at 41-42 (Pl's Exh. 17)).

Basden interviewed Farmer. Farmer stated that Basden did not tell him who on his staff was complaining about his conduct. (Farmer Dep. At 138 (Pl's Exh. 5)). Farmer admitted to telling some stories and jokes and to some touchings, but his version of what had transpired was different. (Basden Dep. at 100-105 (Pl's Exh. 13)). Basden testified: "This was just a situation where one person says one thing and one says it's not true." (Basden Dep. at 85-86 (Pl's Exh. 13)). Basden concluded that Farmer's conduct was inappropriate but not severe or hostile. She further concluded that Farmer had not intended for Plaintiff or Ridge to do anything of a sexual nature or that he was threatening them with their employment. (Basden Dep. at 118-19 (Pl's Exh. 13)). Basden considered: that she felt the incidents were isolated, that Plaintiff and Ridge enjoyed their jobs, and that neither of them had made the hotline call. Id. at 119-20. Basden concluded her investigation with her "summary/recommendations:"

> Based on consistent responses from four Purchasing Dept. Team members and one project accountant, I think that Bruce Farmer has made inappropriate comments that could have been interpreted to be of a sexual nature to staff members and that he has touched females in his department after they have asked him to stop. Although this is a serious offense, I do not think that his intention was "quid pro quo" or that he intended to create a hostile work environment. I recommend that the female purchasing associates be transferred under the supervision of Regena Berg, Senior Purchasing Agent. Farmer should be advised to never take any female staff member behind closed doors alone and to never touch any staff member. Farmer needs to apologize to the department (since all are aware of this accusation and have lost respect for him) and to admit to full responsibility for the perceived inappropriate behavior and to pledge to change going forward. Also, Farmer should be required to repeat the sexual harassment/diversity training program again and Farmer should

-10-

sign the attached acknowledgment form stating that he has attended and understands the policy. I suggest Farmer contact our EAP for counseling on this matter. Obviously, in the future, there can be no retaliation or threatening comments made by Farmer to anyone in the department.

(Pl's Exh. 16). Farmer was not shown a copy of Basden's investigative report. (Farmer Dep. at 168 (Pl's Exh. 5)).

Basden and Barry Spivey, Farmer's supervisor, met with Farmer to discuss the results of the investigation of his conduct. (Farmer Dep. at 120-22 (Pl's Exh. 5)). Farmer was told that the investigation had ended at inconclusive, that there was not enough evidence for them to know exactly what happened. Id. Farmer understood from Spivey that "because of the fact that this had happened that we needed to take some steps to show that we take this serious." Id. at 121-22. Farmer and Spivey entered into a "Memorandum of Consensus/Corrective Action Counseling," dated February 15, 2005. (Pl's Exh. 21). The memorandum stated that he and Farmer had discussed two issues:

- Verbal use of phrases and comments to female subordinates interpreted as inappropriate and offensive.

- Touching female subordinates on the neck and back interpreted as inappropriate and offensive.

Id. This memorandum memorialized Farmer's commitment to take certain steps, including: build trust with team, no one-on-one meetings with door closed, transfer supervision of purchasing associates to Berg, review and coaching in one-on-one meeting with Spivey, and review of training with human resources. Id. Further, Spivey wrote that he would follow up with Farmer on a regular basis to maintain Farmer's commitment. Id.

-11-

Farmer testified: "I did not receive any discipline because there was nothing proved that I had done anything inappropriate. The investigation, to the best of my knowledge, found that was inconclusive and did not prove that I had done anything to either of these people or anyone else. And I was not disciplined." (Farmer Dep. at 126-27 (Pl's Exh. 5)).  The harassment allegations and investigation were not mentioned to Farmer during any of Spivey's performance evaluations of Farmer.  (Farmer Dep. at 181 (Pl's Exh. 5)).  B&C did give verbal discipline to Farmer, coaching, counseling, recommendations, and additional training for sexual harassment.  Id. at 127.  Basden testified that by giving the corrective action counseling to Farmer, B&C had disciplined Farmer. (Basden Dep. at 134 (Def's Exh. R)).

After the investigation, Basden met with Plaintiff and Ridge to tell them the results.  Basden told them Farmer admitted that he had done certain things, he was wrong, he did not realize what he was doing, and he thought of them as daughters.  (Ridge Dep. At 215 (Pl's Exh. 2)).  Basden told Plaintiff and Ridge to "move on, that we needed to just forget about it ."  Id.  Basden also stated: "Y'all don't need to talk to Bruce about things and put him in situations where he has to talk about things like that." Id. at 216.  Basden told Plaintiff and Ridge that they would be supervised by Berg, and that she would decide their raises and write their performance reviews. Id.  Plaintiff testified that Basden did not offer Plaintiff a transfer to any position in February 2005. (Pl. Aff. At ¶ 11 (Pl's Exh. 12)).  After Basden's deposition, she stated that in February 2005 she offered Plaintiff and Ridge the opportunity to transfer to an equivalent position.  (Basden Aff. at ¶ 2 (Def's Exh. W)).

In February or March of 2005, Farmer and Spivey met with the purchasing department in a staff meeting where Farmer stated that if he did something that the employees believed was wrong then he apologized.  (Scales Dep. at 24 (Pl's Exh. 6).  Farmer recalled that he "took a level of

-12-

responsibility for the perception that I had done something wrong." (Farmer Dep. At 138). Farmer

told the group that he would no longer meet alone with Plaintiff or Ridge. (Pl. Dep. at 408 (Exh. 3)).

Farmer also testified that he never admitted any wrongdoing during the staff meeting and he did not

feel he had done anything wrong. (Farmer Dep. at 138 (Pl's Exh. 5)). Spivey told the group that he

admired Farmer's courage to come forth the way he did to apologize for what had happened. (Pl.

Dep. at 350-51 (Pl's Exh.3 )); (Scales Dep. at 25 (Pl's Exh. 6)). Spivey did not say anything in

support of those people in the department who had spoken out against Farmer's conduct. (Pl. Aff.

¶ 10 (Exh. 12)).

### C. Alleged Retaliation Against Plaintiff and Ridge and Continuing Harassment

#### 1. 2005

Soon after the hotline call and investigation, Farmer told Berg and Spivey that Plaintiff and

Ridge had behavior issues, were not team players, and had bad attitudes. (Pl's Exh. 26, 39-41);

(Berg Dep. at 131 (Pl's Exh. 8)). Farmer told Berg that Ridge was controlling the Plaintiff, but Berg

testified that she did not agree with that assessment. (Berg Dep. at 132 (Pl's Exh. 8)). After the

investigation, Farmer remarked to Plaintiff: "I will never be able to fire you now because of the sex

harassment stuff." (Pl. Aff. ¶ 36 (Pl's Exh. 12). Also, when Plaintiff and Ridge would walk down

the hall, Farmer would dramatically throw himself against the wall with his hands up and would

hand work to Plaintiff and Ridge in a mocking, arms-length manner. (Pl. Dep. at 302 (Pl's Exh. 3));

(Scales Dep. at 46 (Pl's Exh. 6)); (Ridge Aff. ¶ 10 (Pl's Exh. 1)).

After the investigation, there was a brief lull when Farmer did not demonstrate unwelcome

conduct to the Plaintiff. (Pl. Dep. at 302 (Pl's Exh. 3)). Then, Farmer began going into Plaintiff's

work area, getting close to her so that his body was near hers, and he would try to look down her

clothes. (Pl. Dep. at 311-12, 338 (Pl's Exh. 3)). Farmer's leaning close conduct occurred frequently and regularly in 2005. (Pl. Aff. ¶ 12,13 (Pl's Exh. 12)). Plaintiff stated that Farmer touched Ridge two or three times in 2005, and one of those times was touching Ridge's face. (Pl. Dep. at 339 (Pl's Exh. 3)). At the 2005 Christmas party, Farmer grabbed Plaintiff's arm. (Pl. Aff. ¶ 13 (Pl's Exh. 12)); (Pl. Dep. at 407 (Pl's Exh. 3)). Basden witnessed the incident and asked Plaintiff if she was all right. (Pl. Dep. at 407-08 (Pl's Exh. 3)). Once in February 2006, Farmer caressed Plaintiff's shoulders at the color copier area, which caused her to complain to Scales in tears. (Pl. Dep. at 311-12 (Pl's Exh. 3)); Scales Dep. at 65-66 (Pl's Exh. 6)). Farmer did not hug the Plaintiff again after the sexual harassment investigation, and Plaintiff did not meet alone with Farmer behind closed doors again. (Pl. Dep. at 335, 413 (Def's Exh. B)). Berg testified: "after about a month, he slacked up, and he was, he started his old ways again, going in there behind ... their desks" and that she personally saw Farmer do this about four or five times in 2005. (Berg Dep. at 102-03 (Pl's Exh. 13)). Scales further corroborates seeing Farmer going back into Plaintiff and Ridge's cubicles after the investigation. (Scales Dep. at 64 (Exh. 6)). Gayle Taylor worked in the purchasing department from January 2005 to November 2006. She stated that she "never witnessed any type of inappropriate conduct by Mr. Farmer towards Ms. Higgins and Ms. Ridge." (Taylor Aff. at ¶ 3 (Def's Exh. U)).

In August 2005, Berg resigned to accept a new job with the City of North Myrtle Beach. In her exit interview, she indicated that she had concerns about Farmer. (Pl's Exh. 23). Berg cited the number one reason for leaving B&C was her supervisor. Id. Berg attached a typed three page document detailing the problems with Farmer. She stated that "Bruce [Farmer] is not trustworthy and I question his integrity." Id. She wrote that Farmer had a lackadaisical approach to the code of conduct policy and that he had committed sexual harassment although B&C just slapped him on the

-14-

wrist.  Id.  Berg explained that Farmer has stated that: B&C does not care about reports of sexual harassment, that B&C is more concerned about reports of criminal activity, and that he would never go down for sexual harassment.  Id.  Berg further opined that the victims [Plaintiff and Ridge] were the ones treated as if they had done something wrong and that Farmer was correct that B&C did not care about sexual harassment.  Id.

In August 2005, Plaintiff and Ridge went to meet with Basden to ask whom they would be reporting to now that Berg was departing; they expressed concern to her that they did not want to report to Farmer.  (Ridge Dep. at 238-39 (Pl's Exh. 2)); (Pl. Dep. at 291-92 (Pl's Exh. 3)).  Basden told Ridge and Plaintiff, "Y'all haven't gotten past this, yet, you can't move on?" (Ridge Dep. at 238-39 (Pl's Exh. 2)).  Plaintiff and Ridge answered "no, ma'am."  Basden responded that "maybe if y'all can't get past this, y'all should transfer, maybe look for another job."  Id.; (Pl. Dep. at 405 (Pl's Exh. 3)).  Plaintiff testified that Basden did not actually offer Plaintiff a transfer in any particular department.  (Pl. Dep. at 405 (Pl's Exh. 3)).  Basden stated that at the August 2005 meeting she asked Plaintiff and Ridge if they were interested in transferring to another department within B&C.  (Basden Aff. at ¶ 2 (Def's Exh. W)).  Plaintiff responded why should I leave when I have not done anything wrong.  (Pl. Dep. at 405 (Pl's Exh. 3)).  Basden told Plaintiff and Ridge that she would speak to Spivey to find out whom they would begin to report to and would let them know, but Basden did not get back with them.  (Ridge Dep. At 239-40 (Pl's Exh. 2)).  After the August 2005 meeting with Basden, Plaintiff and Ridge wrote a letter dated August 4, 2005, to Basden to advise her of their feelings and sent in via interoffice mail (Pl's Exh. 24)  Plaintiff testified that after the letter was mailed, Basden attempted to call Plaintiff about three times and left her voice mail

messages indicating that Basden wanted to speak with Plaintiff alone. (Pl. Dep at 345-50 (Pl's Exh. 3)).

Plaintiff testified:

Q: And why did you and Ms. Basden, why were y'all not able to talk?

A: I didn't want to go over to H.R. anymore.

Plaintiff did return Basden's phone call and left a voice mail message explaining that "they [management] had done nothing to help us, Bruce was still doing the things he was doing, ... that he was being protected, and that we had come to the conclusion that if we were going to continue to work for Burroughs & Chapin, we were going to have to deal with Bruce Farmer." (Pl. Dep. at 345-50 (Pl's Exh. 3)).

### 2. 2006

In January 2006, Danny Millwood entered the department as purchasing manager and became Plaintiff's direct supervisor. (Millwood Dep. at 13, 16, 21 (Pl's Exh. 22)). Millwood reported to Farmer. Plaintiff testified that Millwood was friendly to her at first. (Pl. Dep. at 253 (Pl's Exh. 3)). He began to turn unfriendly to her in or around February 2006. Id. at 253-54. Scales testified that Millwood became "degrading," "belligerent" towards and "extremely rude" to Plaintiff, Ridge and himself. (Scales Dep. at 46-47, 71-73 (Pl's Exh. 6)). Scales stated that Millwood treated others in the department differently. Id. at 47. Plaintiff testified that Millwood treated the other people in the department more friendly. (Pl. Dep. at 254 (Pl's Exh. 3)). Millwood told Plaintiff and Ridge that he was aware that things had happened in the department in the past. (Pl. Aff. ¶ 18 (Exh. 12)); (Ridge Aff. ¶ 12 (Exh. 1)). Millwood was constantly on Plaintiff's back, asking if projects had been completed within the hour, and talking badly to her. (Pl. Dep. at 297-301 (Pl's Exh. 3)). Millwood

-16-

told Plaintiff and Ridge to come into his office and inform him of the substance of every communication they had with anyone.  See also (Ridge Dep. at 43 (Pl's Exh. 2) ("He expected Melissa Higgins, Beth Stocksdale, and I to come to him every time we spoke to a vendor, for every email we ever received. He wanted to know everything that we did.")).  Plaintiff testified that Millwood did not know what he was doing with respect to his job.  (Pl. Dep. at 299 (Pl's Exh. 3)).

In March of 2006, Farmer called Plaintiff into his office, told her that her outfit looked nice and accentuated her body.  (Pl. Dep. at 312 (Pl's Exh. 3)); (Pl. Aff. at ¶ 14 (Pl's Exh. 12)).  Between January and May of 2006, Plaintiff felt that her work environment was very poor, she was very busy at work and felt overworked.  (Pl. Dep. at 297-301 (Pl's Exh. 3)).   Ridge was on maternity leave from March 20, 2006, until around the first of May 2006.  (Ridge Dep. at 20, 30 (Pl's Exh. 2)).

Taylor stated that in late February 2006 she received an invitation to a baby shower for Ridge and that Taylor attended; there were approximately fifty (50) people there including Farmer and Millwood.  (Taylor Aff. at ¶ 2-4 (Def's Exh. U)).  Taylor witnessed that Ridge and Plaintiff appeared to have friendly interactions with Farmer and Millwood.  Id.  Plaintiff recalled that the entire department was invited to the baby shower because they had participated in planning it or paying for it and she does not recall speaking to Farmer or Millwood there.  (Pl. Aff. at ¶ 31 (Pl's Exh. 12)).  Ridge stated that baby showers were common at B&C and she does not recall speaking with Farmer or Millwood there.  (Ridge Aff. at ¶ 22 (Pl's Exh. 1)).  Taylor stated that in March or April 2006, there was a goodbye luncheon for Beth Stocksdale at a restaurant and attendance was voluntary.  (Taylor Aff. at ¶ 6-8 (Def's Exh. U)).  Seven people who worked in the purchasing department attended, including Plaintiff and Ridge, who was on maternity leave.  Id.  Taylor recalled that Ridge sat next to Farmer.  Id.  The luncheon lasted about ninety minutes and everyone appeared to have

a good time. Id. Ridge recalled that she did not sit next to Farmer or Millwood at the luncheon. (Ridge Aff. at ¶ 23 (Pl's Exh. 1)).

Plaintiff had been performing purchasing agent duties since Berg left in August 2005. (Pl. Dep. at 245-26 (Pl's Exh. 3)). Scales had been training Plaintiff on the purchasing agent duties. (Scales Dep. at 110-11 (Pl's Exh. 6)). When a purchasing agent position came open, Farmer stated in March or April of 2006 that Plaintiff would be promoted into the role, that she had been already doing the job, and that he would be getting papers together for her. (Scales Dep. at 109, 111 (Pl's Exh. 6)); Pl. Dep. at 244-45, 246-47 (Pl's Exh.3)). Plaintiff made clear that she wanted the position. (Pl. Aff. ¶ 19 (Pl's Exh. 12)). Scales confirmed that they understood Plaintiff was getting the position. (Scales Dep. at 113-15 (Pl's Exh. 6)). Millwood believed that Plaintiff was capable of performing purchasing agent duties, but did not do anything to help her get the job. (Millwood Dep. at 94 (Pl's Exh. 22)). In fact, Millwood was interviewing other people for the job outside of work and Plaintiff was not aware of that. (Pl. Dep. at 245-46 (Pl's Exh.3)). The job opening was posted on B&C's intranet, but Plaintiff was not looking for it on the intranet because she believed that she did not need to apply for it. (Pl. Aff. at ¶ 19 (Pl's Exh. 12)). Plaintiff knew that sometimes at B&C job openings were not posted on the intranet when B&C planned to promote someone. Id. Ridge was promoted by Farmer to purchasing associate without having to apply for the position, and Ridge does not believe that the job opening was posted on B&C's intranet. (Ridge Aff. at ¶ 25 (Pl's Exh. 1)). At the point in time that Plaintiff discovered that the job was posted on the intranet, she did submit an application, but it was late. Id. Farmer hired Denise Schwenz from a different department within B&C to fill the purchasing agent job. (Schwenz Dep. at 11(Pl's Exh. 48)).

### D. Plaintiff's Salary, Bonuses, and Evaluations

From 2001 to 2004, the Plaintiff testified that she did not have any issues with her performance evaluations and that they were accurate. (Pl. Dep. at 224-25, 283, 285-86 (Def's Exh. B)). Farmer conducted Plaintiff's 2001 mid-year review and gave her a positive evaluation. (Def's Exh. C). As a result of her efforts in 2001, Plaintiff received a salary increase from $10.95/hour to $11.35/hour. (Def's Exh. D, E). For Plaintiff's June 2002 evaluation, Farmer gave her a 3.3 score, and in July 2002 she received an increase in wages to $12 per hour. (Def's Exh. H, K). On August 12, 2002, Plaintiff was promoted to purchasing associate, and she received a 12% raise in salary. (Def's Exh. J). For Plaintiff's December 2002 evaluation, Farmer gave her a 4.15 score which indicated "exceeds expectations." (Def's Exh. I). At her deposition, Plaintiff believed that she did receive an incentive bonus at the end of 2002 but did not remember the amount. (Pl. Dep. at 225-26 (Def's Exh. B)). In Plaintiff's Affidavit she recalled her bonus for 2002 was $2,500. (Pl. Aff. At ¶ 17 (Pl's Exh. 12)).

In June 2003, Farmer conducted Plaintiff's semiannual review, and he gave her a 3.60 score which indicated "meets expectations." (Def's Exh. L). The evaluation form indicated in small print under "behavioral goals" section: "Use of behavioral goals is not required. Please use when needed to highlight or address growth areas for employees." Id. No behavioral goal was indicated for Plaintiff. Id. No year end 2003 evaluation is in the record. In Plaintiff's Affidavit she recalled her bonus for 2003 was $2,600. (Pl. Aff. At ¶ 17 (Pl's Exh. 12)).

On the June 2004 semiannual evaluation, Farmer gave the Plaintiff a 3.65 score which indicated "exceeds expectation." (Def's Exh. M). The evaluation form indicated in small print under "behavioral goals" section: "Use of behavioral goals is not required. Please use when needed to highlight or address growth areas for employees." Id. No behavioral goal was indicated for

Plaintiff.  Id.  For the year end 2004 evaluation, Farmer gave Plaintiff a 3.90 score which indicated "exceeds expectations."  (Def's Exh. N).  The evaluation form indicated in small print under "behavioral goals" section: "Use of behavioral goals is not required.  Please use when needed to highlight or address growth areas for employees."  Id.  No behavioral goal was indicated for Plaintiff.  Id.  In Plaintiff's Affidavit she recalled her bonus for 2004 was $3,000.  (Pl. Aff. At ¶ 17 (Pl's Exh. 12)).

Berg conducted Plaintiff's semiannual evaluation in 2005, and Berg and Farmer signed it.  (Def's Exh. P).  Plaintiff received a 3.3 score.  Id.  Plaintiff testified that she believed 3.3 was an accurate score.  (Pl. Dep. at 288 (Pl's Exh. 3)).  Plaintiff also stated that Regena [Berg] told her that Bruce had changed the score; Berg had given Plaintiff a 5 for customer service and Farmer changed it to a 4.  Id. at 288-89.  Plaintiff did not ask Farmer why he had changed the score, but she did ask Berg why was Farmer permitted to do that when Berg was supposed to be doing the reviews for Plaintiff and Ridge.  Id. at 290-91.  Berg told Plaintiff that Farmer still had the ultimate say-so.  Id.  Basden explained that it is not unusual at B&C for an immediate supervisor to evaluate an employee and then for a department head to modify the evaluation.  (Basden Aff. at ¶ 3 (Def's Exh. W)).  Farmer told Plaintiff and Ridge that even if supervisors were writing evaluations he would be deciding the amount of the raises.  (Pl. Aff. ¶ 15 (Pl's Exh. 12); (Ridge Aff. ¶ 11 (Pl's Exh. 1)).  For the first time at B&C, Plaintiff's evaluation contained a "performance behaviors" attachment.  It indicated under "teamwork" that Plaintiff worked exceptionally well with supervisors, co-workers and external customers, and the score was 4 for "teamwork."  (Def's Exh. P).  Berg testified that she completed the behavioral section, which was optional, to show that in her opinion there was not an issue.  (Berg Dep. at 130-31 (Pl's Exh. 8)); (Basden Aff. at ¶ 3 (Def's Exh. W)).  Basden testified

-20-

that whether a behavioral analysis is done is in the discretion of management, and she further explained in her affidavit that "[t]he behavioral component is not intended for disciplinary purposes nor is it utilized for problem employees." (Basden Dep. at 129 (Exh. 13)). Berg had decided that in order to protect Plaintiff and Ridge that she needed to write a behavioral section on them. During the meeting where Spivey asked Berg to be Plaintiff's supervisor, Berg heard Farmer say to Spivey that Plaintiff and Ridge were not team players and had bad attitudes. (Berg Dep. At 130-32 (Pl's Exh. 8)).

Farmer conducted the Plaintiff's year end evaluation for 2005, and Plaintiff received a 3.3 score. (Def's Exh. Q). The record shows that Plaintiff did receive a behavioral goal score of 3.00 but no additional form is attached. Id. Plaintiff testified that she agreed with the evaluation as rendered. (Pl. Dep. at 293 (Def's Exh. B)). According to Basden, Plaintiff's payroll records reveal that Plaintiff received an incentive bonus totaling 11.5% of her annual salary in December 2005. (Basden Aff. at ¶ 4 (Def's Exh. W). In Plaintiff's Affidavit, she recalled her bonus for 2005 was $3,600. (Pl. Aff. At ¶ 17 (Pl's Exh. 12)).

In 2006, Millwood and Farmer went to HR and spoke with Tara Little two or three times before evaluations to discuss Plaintiff's complaining. (Little Dep. at 53-56 (Exh. 15)). "The opinion was that Melissa was a good employee. She didn't complain a lot or any prior to Jamie starting work. And then after Jamie started, they tended to complain together." (Little Dep. at 54 (Pl's Exh. 15). Little understood that Millwood was doing a behavioral analysis on Ridge because of the alleged influence Ridge had on Plaintiff. (Little Dep. at 53-54 (Exh. 15)). Millwood testified that neither Ridge nor Plaintiff ever complained to him. (Millwood Dep. at 70-71 (Exh. 22)). Millwood performed Plaintiff's mid-year evaluation on May 11, 2006, and he did write a behavioral review.

(Ridge Aff. ¶¶ 13-14 (Exh. 1); (Pl. Dep. at 355-56 (Def's Exh. B)).  Plaintiff was upset about the behavioral section of the review but not about the 3.3 score.  (Pl. Dep. at 356 (Def's Exh. B)).[4] Plaintiff told Millwood that she disagreed with the evaluation especially where it indicated that she was a weak person that others could negatively influence.  Id. at 357.  Plaintiff testified that during her review meeting Millwood stated that she was not compliant, was not doing her job, that he could be her "best friend or worst enemy," and that her future reviews would be horrible if she did not change.  (Pl. Dep. at 249-50 (Pl's Exh. 3)).

Millwood testified that he decided to write a behavioral analysis on Plaintiff and, to be fair, on all of the employees.  (Millwood Dep. at 40 (Pl's Exh. 22)); (Millwood Dep. at 41 (Def's Exh. Y)).  By May of 2006, Plaintiff and Ridge reported to Millwood; Stocksdale had departed in March of 2006.  (Millwood Dep. at 16, 21 (Pl's Exh. 22)).  Also, Gayle Taylor worked in purchasing in May 2006.  (Taylor Dep. at 25, 31 ((Pl's Exh. 7)).  The overall score given to Plaintiff and Ridge by Millwood in May 2006 was in the top 5% of scores he had given during his twelve years with B&C during reviews of 700 or 800 people.  (Millwood Dep. at 97-87 (Def's Exh. Y)).

### E. Plaintiff's Resignation and B&C's Alleged Defamation

Plaintiff testified that Millwood's evaluation and his comments during the review were "pretty much the last straw." (Pl. Dep. at 363 (Def's Exh. B)).  Plaintiff stated that it was "worse and worse" at work, that "it had gotten so bad at Burroughs & Chapin." Id.  Plaintiff had knots and pains in her stomach, lost sleep, experienced mood problems and headaches, and she became increasingly uncomfortable being around men. (Pl. Dep. at 367-74 (Pl's Exh. 3)).  Ridge observed Plaintiff

---

[4] During her first evaluation, Ridge was told by Farmer that behavioral analyses were only performed for problem employees.  (Ridge Dep. at 140 (Pl's Exh. 2)).

becoming upset on more than one occasion. (Ridge Aff. ¶ 29 (Pl's Exh.1)).  On the evening of May

11, Plaintiff and Ridge, with their husbands present, decided to resign.  Id. at 366.  Plaintiff's

mother's health did not factor into her decision to resign.  (Pl. Aff. at ¶ 25 (Pl's Exh. 12)).  Plaintiff

and Ridge decided to start their own cleaning business.  (Pl. Dep. at 106, 108 (Def's Exh. B)).  On

Friday, May 12, 2006, Plaintiff and Ridge gave their resignation letters to Millwood and two-weeks

notice. (Pl. Aff. ¶ (Exh. 12)).  Millwood did not understand the explanation in the resignations

(Millwood Dep. at 53 (Pl's Exh. 22)).  Millwood testified that he did not ask Plaintiff or Ridge their

reasons for resigning because, after speaking to Little and Farmer, he understood that they likely

resigned because of their issues with Farmer.  (Millwood Dep. at 47-51 (Pl's Exh. 22)).  Millwood

took the letters to Little in HR and they discussed accepting their resignations and moving on.

(Millwood Dep. at 54 (Pl's Exh. 22)).  Little stated that on Monday morning (May 15, 2006)

Millwood asked Little if we could ask Plaintiff and Ridge to leave immediately.  (Little Dep. at 63

(Pl's Exh. 15)).  Millwood characterized Plaintiff and Ridge as "disgruntled." (Millwood Dep. at 67-

68 (Exh. 22)).  Millwood stated that "the recommendation was made that they not be required to

work their two weeks notice period and I agreed with that recommendation."  (Millwood Aff. at ¶

3 (Def's Exh. CC)).

Millwood stated that his basis for claiming that Plaintiff and Ridge were disgruntled was

based on information provided by Farmer.  (Millwood Dep. at 67-69 (Pl's Exh. 22)).  Millwood

further stated: "[O]bviously they had issues with Bruce Farmer.  And so obviously, in my mind, to

me, that's being a little disgruntled."  Id.  Millwood stated that on the Monday after Plaintiff and

Ridge had submitted resignations he observed that the employees in purchasing were not working

as they should.  (Millwood Aff. at ¶ 3 (Def's Exh. CC)).  Little testified that "she took Danny

[Millwood]'s word for it" that Plaintiff and Ridge were disrupting the department on Monday. (Little Dep. at 74-75 (Pl's Exh. 15)).  Little stated that she believed that they had passed out resignation letters, were telling other employees they were leaving, and were not working.  Id. Farmer testified that Plaintiff and Ridge were not being disruptive on Monday morning.  (Farmer Dep. at 187-88 (Pl's Exh. 5)).  Millwood called Plaintiff and Ridge into his office where Little gave them paychecks and boxes, and Little told Plaintiff and Ridge that they must leave immediately.  (Pl. Dep. at 383-84 (Pl's Exh. 3)); (Ridge Dep. at 100-01 (Pl's Exh. 2)).

Human resources' employees testified that other B&C employees have been asked to leave immediately when he or she violated company policies and procedures or had access to highly confidential information and that it was in management's discretion.  (Little Dep. at 79, 90 (Pl's Exh. 15)); (Broderick Dep. at 34-35 (Pl's Exh. 4)).  Plaintiff stated that in the purchasing department both Stocksdale and Berg worked a notice period.  (Pl. Aff. at ¶ 33 (Pl's Exh. 12)).  Beth Stocksdale received a goodbye luncheon in March or April 2006.  (Taylor Aff. at ¶ 6 (Def's Exh. U)).

B&C's president, Doug Wendel, heard that rumors were going around that Plaintiff and Ridge had resigned because they were being harassed by Farmer.  (Wendel Dep. at 28 (Pl's Exh. 14)).  Spivey told Wendel that Plaintiff and Ridge were asked to leave B&C immediately because of those rumors.  Id. at 31, 46-47.  Wendel held a meeting of all employees who work on the fourth floor to explain why Plaintiff and Ridge were asked to leave early.  Id. at 45.  The departments on the fourth floor were purchasing, corporate administration, risk management, procurement, budget, design and construction, project accounting, graphics information services, public relations, the executive staff, and general counsel.  (Spivey Dep. at 94-95 (Pl's Exh. 18)).  Wendel outlined the procedures B&C had for employee concerns and issues and told everyone that Plaintiff and Ridge

were asked to leave early with pay because "they were not conducting their business affairs in an appropriate manner, period." (Wendel Dep. at 45-46 (Pl's Exh. 14)). Wendel stated that the two employees who were asked to leave were "disgruntled," there were some serious allegations, to disregard the allegations, B&C was supporting Bruce 100 percent, and an investigation was ongoing and that it would be resolved. (Scales Dep. at 56 (Pl's Exh. 6)).

Wendel testified that his knowledge of Plaintiff and Ridge's conduct after their resignation came from Spivey. (Wendel Dep. at 46-47 (Pl's Exh. 14)). Spivey had no personal knowledge of Plaintiff and Ridge's conduct after their resignation; he received his information from Basden. (Spivey Dep. at 83-84 (Pl's Exh. 18)). Basden testified: "I don't know that they were disruptive." (Basden Dep. at 34 (Pl's Exh. 13)). Basden stated that Little and Millwood told her that a lot of discussion was going on in other departments and work was not being done. Id. at 34. Basden stated that Millwood did not need the Plaintiff and Ridge for the two weeks. Id. at 33.

### F. Plaintiff and Ridge's Cleaning Business

At the time Plaintiff resigned, she and Ridge decided to open their own cleaning business. At the deposition, Plaintiff testified that she devoted about twenty hours per week to her cleaning business. (Pl. Dep at 113 (Def's Exh. B)). At some point after the deposition, Plaintiff and Ridge lowered some prices in the hope to get more work. (Pl. Aff. at ¶ 27 (Pl's Exh. 12)). They have spent many hours promoting the business, and the income has grown. (Ridge Aff. At ¶ 27-28 (Pl's Exh. 1)). Plaintiff and Ridge do not desire to work part-time; if the business does not grow into a full time opportunity, they will seek other employment. Id.; (Pl. Aff. at ¶ 27 (Pl's Exh. 12)).

### G. Plaintiff's Complaints Post-Employment

Plaintiff filed an Affidavit and Charge of Discrimination on May 18, 2006 wherein she declared that the she was first subjected to discrimination in approximately April 2003 and the latest date of discrimination was May 15, 2006. (Def's Exh. F). Plaintiff checked the boxes for discrimination based on "sex" and "retaliation." Plaintiff did not check the box for "continuing violation." Her charge stated:

> I was employed by Respondent as a purchasing agent. Throughout my employment I was subjected to harassment on the basis of my sex. Respondent failed to take any action to prevent the harassment or to rectify the same. After I reported the harassment, Respondent discriminated against me further and retaliated against me by, among other things, harassing and intimidating me, disciplining me, and failing to give me a raise commensurate with my performance. This harassment retaliation culminated in the constructive termination of my employment on May 15, 2006.

Id. Plaintiff filed her lawsuit on May 31, 2006, in the Horry County Court of Common Pleas. Plaintiff received her EEOC right-to-sue letter dated November 8, 2006, and the SHAC notice of right to sue was dated October 30, 2006. After the Plaintiff filed an amended complaint, Defendants removed this action to the United States District Court on December 13, 2006.

## III.    STANDARD OF REVIEW

The moving party bears the burden of showing that summary judgment is proper. Summary judgment is proper if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Rule 56(c), FRCP; Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Summary judgment is proper if the non-moving party fails to establish an essential element of any cause of action upon which the non-moving party has the burden of proof. Celotex, 477 U.S. 317. Once the moving party has brought into question whether there is a genuine issue for trial on a material element of the non-moving party's claims, the non-moving party bears the burden of coming

forward with specific facts which show a genuine issue for trial. Fed.R.Civ.P. 56(e); <u>Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574 (1986). The non-moving party must come forward with enough evidence, beyond a mere scintilla, upon which the fact finder could reasonably find for it. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986). The facts and inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party. <u>Shealy v. Winston</u>, 929 F.2d 1009, 1011 (4th Cir. 1991). However, the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. <u>Barber v. Hosp. Corp. of Am.</u>, 977 F.2d 874-75 (4th Cir. 1992). The evidence relied on must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits." <u>Mitchell v. Data General Corp.</u>, 12 F.3d 1310, 1316 (4th Cir. 1993).

Rule 56(e) provides, "when a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." <u>See also</u> <u>Celetex Corp. v. Catrett</u>, 477 U.S. 317, 324 (1986)(Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves"). To raise a genuine issue of material fact, a party may not rest upon the mere allegations or denials of his pleadings. Rather, the party must present evidence supporting his or her position through "depositions, answers to interrogatories, and admissions on file, together with ... affidavits, if any." <u>Celetex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). <u>See also</u> <u>Cray Communications, Inc. v. Novatel Computer Systems, Inc.</u>, 33 F.3d 390 (4th Cir. 1994); <u>Orsi v. Kickwood</u>, 999 F.2d 86 (4th Cir. 1993); Local Rules 7.04, 7.05, D.S.C.

IV.     **DISCUSSION**

**A. Claims against B&C based upon Title VII sex discrimination and harassment**

**1. Continuing Violation Doctrine**

Defendant moves for summary judgment on the ground that Plaintiff cannot rely on the "continuing violation" doctrine to hold B&C liable for Farmer's alleged sexual harassment that occurred as far back as 2001. B&C argues that Plaintiff cannot recover for acts which occurred prior to February 2005 because B&C took intervening action that broke the causal link, and the conduct that occurred prior to the intervening action cannot be part of this hostile work environment claim. Therefore, B&C argues if the alleged harassment between 2001 and February 2005 cannot be part of this hostile work environment claim, the statute of limitations has run because those acts occurred more than 300 days prior to May 18, 2006, the date the Plaintiff filed her complaint with the EEOC and SHAC.

To pursue a claim under Title VII, a plaintiff must file a complaint with the EEOC within either 180 days or 300 days "after the alleged unlawful employment practice occurred." National R.R. Passenger Corp. v. Morgan, 536 U.S. 101 (2002) (citing 42 U.S.C. § 2000e). The Morgan Court held that "the statute precludes recovery for discrete acts of discrimination or retaliation that occur outside the statutory time period" but that behavior alleged outside of the statutory time period may be considered "for the purposes of assessing liability, so long as an act contributing to the hostile environment takes place within the statutory time period." Id. at 105. Hostile environment claims occur over a series of days or perhaps years; a hostile environment claim is based upon the cumulative effect of individual acts. Id. at 115. "In order for a claim to be timely, the employee

need only file a charge within 180 or 300 days of any act that is part of the hostile work environment." Id. at 118.

"The Supreme Court made clear…that the reach of the continuing violations doctrine in the context of a hostile work environment claim is not limitless.  The otherwise time-barred conduct must be related to non-time-barred conduct and the employer may be able to take intervening curative action that cuts off the temporal reach of the hostile work environment claim." Wallace v. Chicago Hous. Auth., 298 F. Supp. 2d 710, 716 (N.D. Ill. 2003).  See Hughes v. Conway Hosp., Inc., C/A No. 4:04-875-TLW-TER (D.S.C. 2006) (finding no continuing violation where the employer's actions of investigating plaintiff's sexual harassment claims, assigning the perpetrator to a different shift, and instructing perpetrator and plaintiff not to be alone in a room, were effective to end the harassing behavior for fifteen months); Randall v. Potter, 366 F. Supp. 2d 104, 118 (D.Me. 2005) (finding effective intervening action where employer transferred an employee, disciplined another, and plaintiff was placed on a different crew); Vickers v. Powell, 493 F.3d 186, 199-200 (D.C. Cir. 2007) (noting that sometimes a change in manager may constitute an intervening action, but in this case the management change was not intended to address the work environment and the harassment intensified); Rowe v. Hussmann Corp., 381 F.3d 775, 780-81 (8th Cir. 2004) (finding no sufficient intervening action by employer where supervisor warned perpetrator to stop the conduct and it did stop for seven months, distinguishing a case where the harrasser and victim had no contact for 21 months).

Defendants argue that the following intervening actions taken by B&C in February 2005 changed Plaintiff's work environment such that it was no longer hostile: B&C promptly investigated the hotline telephone call regarding Farmer's conduct; B&C disciplined Farmer; B&C placed

-29-

Plaintiff and Ridge under a new supervisor, Berg; Basden offered Plaintiff the opportunity to transfer to a different department; B&C required Farmer to apologize to his department; B&C sent Farmer to sexual harassment training; and B&C instructed Farmer to have only open door meetings with Plaintiff and Ridge.  Plaintiff argues that Farmer was not actually disciplined because Farmer testified that he was not disciplined because it was not proved that he had done anything inappropriate.  The court finds that even in the light most favorable to Plaintiff B&C did discipline Farmer even if B&C did not use the word "discipline."  Farmer testified that he did receive verbal discipline, and coaching and counseling.  (Farmer Dep. at 127 (Pl's Exh. 5)).  Farmer was instructed to have no further closed door meetings with Plaintiff, and there is no evidence in the record of any closed door meetings between Plaintiff and Farmer or hugs after B&C's instruction.  Farmer also attended sexual harassment training at B&C's request.  B&C through Basden promptly investigated the hotline telephone call and promptly gave Farmer a memo of "consensus corrective action counseling" on February 24, 2005.  Spivey, Farmer's supervisor, sometime during the investigation explained to Farmer the seriousness of the situation, but Farmer stated that during his performance reviews the sexual harassment allegations against him did not come up.  The court cannot give any consideration to Defendant's assertion that the Plaintiff could have transferred to another department. In the light most favorable to the Plaintiff, the court finds that Basden did not offer Plaintiff a transfer to another department in February 2005.

Even though B&C took certain proactive steps in an attempt to alter the Plaintiff's hostile work environment, the result was not successful or effective in deterring Farmer.  Within one or several months sexually harassing conduct occurred again, including: Farmer grabbed Plaintiff's arm, caressed her shoulders, continued leaning over her, trying to look down her clothes, and

-30-

commenting on her body.  Berg and Scales corroborated that this unwelcome conduct occurred after the February 2005 investigation.  Several people testified that in Farmer's apology to the department he did not really admit any wrongdoing.  Also, in August of 2005, Plaintiff and Ridge informed Basden verbally in a meeting, and in a letter dated August 5, 2005, that Farmer's sexually harassing conduct was continuing and that Farmer was "bad mouthing" their work and they feared he was retaliating.  In that meeting, Basden stated to Plaintiff and Ridge, "you haven't gotten over this yet? ... if you can't get past this, y'all should transfer, maybe look for another job."  Although Plaintiff was told to report to Berg, a reasonable juror could conclude that Berg was the supervisor in name only.  Farmer let Berg and Plaintiff know that he had the ultimate say so about Plaintiff's raises.  Also, Farmer changed one score on Berg's written evaluation of Plaintiff.  After August 2005 when Berg resigned until January 2006 when Millwood joined the department, it appears that Farmer was Plaintiff's direct supervisor again and wrote her December 2005 evaluation even though Plaintiff and Ridge had specifically discussed with Basden that they not be required to report to him.  In the light most favorable to the Plaintiff, she and Ridge informed B&C that Farmer's conduct had not really stopped and B&C did not take further action to remedy the situation.  Accordingly, as a matter of law, B&C's actions cannot be deemed effective remedial intervening action.  Plaintiff's claim for a hostile work environment should be permitted to include Farmer's conduct beginning in 2001 until May 15, 2006, because at least one discreet act -- Farmer's caressing Plaintiff's shoulders -- occurred in February 2006 within the 300-day window.

Defendants further argue that Plaintiff cannot use the continuing violation doctrine because on several occasions Plaintiff failed to report Farmer's conduct to management when she knew that his conduct may have been considered sexual harassment.  However, the Morgan Court explained

-31-

that discrete acts of discriminatory behavior that occurs outside the statutory time period may be considered "for the purposes of assessing liability, so long as an act contributing to the hostile environment takes place within the statutory time period." Morgan, 536 U.S. at 105. Here, the unwelcome conduct that began in 2001 and continued until 2006 was similar and it was committed by the same person. Therefore, all of the unwelcome conduct was related and is part of the same actionable hostile work environment practice. The Morgan court noted that even if the plaintiff knew on a certain day that actionable conduct happened that is not relevant to the inquiry of whether the charge was filed within 180 or 300 days of any act that is part of the hostile work environment. Id. at 118. Accordingly, whether Plaintiff knew that Farmer's conduct constituted sexual harassment back in 2002 does not affect the continuing violation / intervening action analysis.

Defendants argue that because Plaintiff indicated on her EEOC charge that the discrimination began in approximately April 2003 and Plaintiff did not check the "continuing violation" box, Plaintiff's claim for hostile work environment based on any conduct from 2001 up to April 2003 is time barred. Plaintiff argues that the factual section on her EEOC charge stated "[t]hroughout my employment I was subjected to sexual harassment...." Plaintiff argues that the factual statement is the crucial element and that what box is checked does not control the scope of the complaint. Plaintiff asserts that her allegations in the complaint filed in this court are reasonably related to the EEOC charge of discrimination and could have been developed by a reasonable investigation of the EEOC charge.

The scope of a private action is defined by the scope of the administrative charge from which it arises and from any findings that arise out of the investigation of the charge. EEOC v. General Elec. Co., 532 F.2d 359, 365 (4th Cir. 1976). Therefore, only those discrimination claims stated in

the initial charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint may be maintained in a subsequent lawsuit. Evans v. Technologies Applications & Serv. Co., 80 F.3d 954, 962-63 (4th Cir. 1996) (sexual harassment and discriminatory pay and benefits claims dismissed because EEOC charge alleged only a failure to promote); Dennis v. County of Fairfax, 55 F.3d 151, 156-57 (4th Cir. 1995) (hiring, promotion, and training discrimination claims dismissed where EEOC charge alleged only discriminatory discipline). In Chacko v. Patuxent Inst., 429 F.3d 505, 511 (4th Cir. 2005), where the plaintiff failed to check the "continuing violation" box, the Court noted that the failure to check the box was not surprising given that his charge was for one specific harassing act on December 21, 1999, and the facts did not allege a continuing pattern of abuse. The Fourth Circuit noted that the plaintiff's EEOC administrative charges could hardly have led to an investigation that would have uncovered the type of harassment brought out at the trial. Id. at 512. The Court was concerned that the administrative charges and the evidence at trial described two different cases. Id.

In this case, because the Plaintiff explained in the EEOC charge that the sexual harassment continued "throughout her employment" and a reasonable investigation would have uncovered the date that her employment began and the dates of the first unwelcome conduct, the court feels that the unwelcome conduct from 2001 up to April 2003 (date listed in EEOC charge) which the Plaintiff seeks to prove at trial is reasonably related to the sexual harassment alleged in the EEOC charge. The conduct from 2001 to April 2003 versus the conduct from April 2003 to May 2006 involves the same actors and discriminatory conduct. Also, the Plaintiff did write "approximately" April 2003. This court concludes that Plaintiff's EEOC charge should not preclude the Plaintiff from relying on unwelcome conduct back to 2001 for the hostile work environment claim.

-33-

## 2. Hostile Work Environment – Severe or Pervasive

To establish a hostile work environment claim, Plaintiff must present evidence to prove the following elements: 1) she was subjected to unwelcome conduct in a work related setting; 2) the conduct complained of was based on her sex; 3) the conduct was sufficiently severe or pervasive to alter her conditions of employment and to create an abusive work environment; and 4) the conduct is imputable on some factual basis to her employer.  Ocheltree v. Scollon Productions, Inc., 335 F.3d 325, 331 (4th Cir.2003) (en banc); Spicer v. Com.of Va. Dep't of Corrections, 66 F.3d 705, 710 (4th Cir.1995) (en banc); Brown v. Perry, 184 F.3d 388, 393 (4th Cir.1999).

Defendants move for summary judgment on the ground that as a matter of law the alleged harassment was not severe or pervasive.  Defendants focus solely on conduct after the February 2005 investigation because, as set forth above, it argues that Farmer's prior conduct may not be considered by the court.  Defendants argue that Plaintiff's testimony established that after February 2005 Farmer touched the Plaintiff no more than three times and complimented her outfit and that these were isolated incidents that did not create an abusive atmosphere.  Defendants further argue that Millwood's no-nonsense or rude management style was not severe or pervasive, that there is no evidence that Millwood acted that way because Plaintiff is a female, and that Farmer and Millwood's conduct did not interfere with her ability to perform her job.

To qualify as severe and pervasive for purposes of Title VII, the harassment must be objectively and subjectively severe or pervasive as to alter the conditions of plaintiff's employment and render the workplace abusive.  Faragher v. City of Boca Raton, 524 U.S. 775, 786 (1998); E.E.O.C. v. Sunbelt Rentals, Inc., 521 F.3d 306 (4th Cir. 2008); Hartsell v. Duplex Products, 123 F.3d 766, 773 (4th Cir. 1997).  To be objectively offensive, the conduct must create "an environment

-34-

that a reasonable person would find hostile or abusive." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21-22 (1993). The Fourth Circuit has utilized an approach evaluating all of the circumstances in determining whether conduct was objectively abusive, including: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it was physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interfered with plaintiff's work performance. Ocheltree v. Scollon Productions, Inc., 335 F.3d 325, 333 (4th Cir. 2003). The objective inquiry cannot be a mathematically precise test and no single factor is dispositive. E.E.O.C. v. Sunbelt Rentals, Inc., 521 F.3d 306, 315 (4th Cir. 2008). This legal standard is designed to filter out complaints attacking "'the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing.'" Ocheltree, 335 F.3d at 333 (quoting Faragher, 524 U.S. at 788). A workplace is sufficiently severe or pervasive when it "is permeated with discriminatory intimidation, ridicule, and insult." Harris v. Forklift Systems, Inc., 510 U.S. 17, 20 (1993)(internal quotation omitted). Title VII forbids "only behavior so objectively offensive as to alter the 'conditions' of the victim's employment." Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 81 (1998). The conduct must be sufficiently severe and pervasive to "ensure that courts and juries do not mistake ordinary socializing in the workplace – such as male-on-male horseplay or intersexual flirtation – for discriminatory conditions of confinement." Id. As the Fourth Circuit Court of Appeals recently explained, "plaintiffs must clear a high bar in order to satisfy the severe or pervasive test. ... The task on summary judgment is to identify situations that a reasonable jury might find to be so out of the ordinary as to meet the severe or pervasive criterion." E.E.O.C. v. Sunbelt Rentals, Inc., 521 F.3d at 315-16.

-35-

For reasons set forth above, the court believes that Farmer's conduct from 2001 to May 2006 can be considered with regard to Plaintiff's hostile work environment claim.  Plaintiff claims that Farmer's conduct was sufficiently severe or pervasive to alter her conditions of employment and to create an abusive work environment.  Throughout Plaintiff's time in the purchasing department, Farmer frequently leaned over Plaintiff, touched Plaintiff, and made sexually suggestive comments to her.  On occasion, Farmer hugged Plaintiff and his hands would touch her buttocks.  Farmer often discussed various women's bodies explaining what parts he liked, tried to look down Plaintiff's clothes, told offensive stories with sexual content ("blow job," prostitute, and how he got a "woody" every day), and tried to demonstrate with his hands the size of his penis.  Farmer's conduct was frequent rather than isolated.  He used language that demeaned her based on her sex ("dumb blonde bimbos") and engaged in other conduct that was humiliating.  Farmer told Plaintiff and Ridge that they were lucky to have their jobs and no one else would hire them; these statements could be abusive remarks based upon sex.  Plaintiff's showing is not as strong on the issue as to whether Farmer's conduct unreasonably interfered with Plaintiff's work performance.  Plaintiff testified that she felt sick during the work day because of Farmer's conduct and that she tried to avoid Farmer.  Ridge observed Plaintiff numerous times become distressed at work and get upset as a result of Farmer's conduct.  Scales corroborated that he saw Plaintiff in tears one day after Farmer touched her, and Ridge stated that on several occasions Plaintiff cried.  Although considering each episode and event in isolation may not be too severe, considering all the circumstances and Farmer's conduct together, Plaintiff's showing on the Ocheltree factors is sufficient to defeat the motion for summary judgment.

### 3. Hostile Work Environment – Ellerth-Faragher Defense

-36-

Defendant argues that as a matter of law no "tangible employment action" occurred and B&C can establish the two elements of the Ellerth-Faragher affirmative defense, and thus, the court should find that Farmer's conduct cannot be imputed to B&C. Plaintiff argues that the Ellerth-Faragher affirmative defense is not available to B&C because Plaintiff's supervisor was the harrasser and Farmer's conduct culminated in a "tangible employment action." The United States Supreme Court held that if the offending party is the plaintiff's supervisor the employer will be strictly liable where the harassment culminated in a tangible employment action. Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998). If the offending supervisor did not commit a tangible employment action, the employer can avoid liability if it can show (1) that it exercised reasonable care to prevent and promptly correct any sexually harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities that the employer provided. Id. See also Matvia v. Bald Head Island Mgmt., Inc., 259 F.3d 261, 266 (4th Cir. 2001) (noting that examples of tangible employment action include discharge, demotion or undesirable reassignment).

Defendants argue how nothing that happened to Plaintiff culminated in a "tangible employment action." Defendants discount a litany of possible actions that Plaintiff may claim satisfy this legal standard; however, in Plaintiff's Opposition Brief she argues that two different tangible employment actions happened – failure to promote and constructive discharge. Accordingly, the court will address only those claims.

Plaintiff argues that on or around April 2006 Farmer failed to promote her into the purchasing agent position. Little posted the job on B&C's intranet on April 24, 2006, and the deadline to apply was May 1, 2006. Denise Schwenz, who had worked at B&C for five years in a different department, timely applied for the position, and Farmer selected her for the job. Plaintiff did submit

-37-

an application for the job position on May 9, 2006, eight days after the deadline. Plaintiff explained that she had not looked on the intranet for the job posting because she had discussed the job with Farmer and did not know that the job would be advertised or that she needed to apply. Farmer knew that Plaintiff wanted the promotion, and he had informed the department (and Plaintiff specifically) that she would get the promotion. Scales corroborated that Farmer had informed the department that Plaintiff would get the promotion. When Plaintiff was promoted from purchasing assistant to purchasing associate, she did not have to formally apply or look for the job posting on the intranet; Farmer had just told Plaintiff that she received that promotion. Defendant argues that because the Plaintiff applied for the job late then her failure to receive a promotion to that job cannot be attributed to B&C.[5] See King v. Marriott Int'l, Inc., C/A No. 9:05-1774-PMD-RSC, 2007 WL 951738 at *10 (D.S.C. March 27, 2007) (noting that for a retaliation claim the employer's failure to affirmatively find and recommend new jobs to plaintiff cannot be considered an adverse employment action). Under the circumstances of this case where Plaintiff did not think the job would be posted due to Farmer's promise to promote her, there is evidence that Farmer's sexual harassment culminated in his refusal to promote Plaintiff, which constitutes a tangible employment action.

Additionally, Plaintiff argues that her constructive discharge is a "tangible employment action." The United States Supreme Court explained how the Ellerth-Faragher affirmative defense should play out where constructive discharge is alleged, and the Court declared that the said defense can be available in constructive discharge cases in certain circumstances. In Pennsylvania State Police v. Suders, 542 U.S. 129, 134 (2004), the Supreme Court held that where a plaintiff can show

---

[5] Defendant also argues that Plaintiff cannot show that a male was hired for the purchasing agent position and thus her claim fails. This argument is misplaced. Plaintiff is not trying to prove a prima facie claim for failure to promote based upon sex.

"that the abusive working environment became so intolerable that her resignation qualified as a fitting response," the employer may defend against such a claim by proving "both (1) that it had installed a readily accessible and effective policy for reporting and resolving complaints of sexual harassment, and (2) that the plaintiff unreasonably failed to avail herself of that employer-provided preventive or remedial apparatus." Id. The Court further held that this affirmative defense is not available to the employer "if the plaintiff quits in reasonable response to an employer-sanctioned adverse action officially changing her employment status or situation, for example, a humiliating demotion, extreme cut in pay, or transfer to a position in which she would face unbearable working conditions." Id. The Court explained that for a plaintiff to prove a hostile work environment constructive discharge claim the plaintiff must prove something more than an actionable sexual harassment claim. Id. at 146-48. A plaintiff must show that working conditions were so intolerable that a reasonable person would have felt compelled to resign. Id. See Breeding v. Arthur J. Gallagher and Co., 164 F.3d 1151, 1159 (8th Cir. 1999) (noting that the supervisor's continuous fondling of his genitals in front of plaintiff and using lewd and sexually inappropriate language survived summary judgment on a sexual hostile work environment claim but that as a matter of law the sexual harassment was not so intolerable that a reasonable person would be forced to quit); Perry v. Harris Chernin, Inc., 126 F.3d 1010, 1015 (7th Cir. 1997) (noting that unless conditions are beyond "ordinary" discrimination, the complaining employee is expected to remain on the job while seeking redress).

Courts have held that the following factors do not render a working environment intolerable: dissatisfaction with work assignments, feeling of being unfairly criticized, difficult or unpleasant working conditions, and a stressful environment. See Honor v. Booz-Allen & Hamilton, Inc., 383

F.3d 180 (4th Cir. 2004); <u>Williams v. Giant Food, Inc.</u>, 370 F.3d 423 (4th Cir. 2004). However, if management is indifferent to the employee's reported complaints and there is no chance of fair treatment or if there is a lack of recourse within the organization, those considerations can factor into whether the working environment was intolerable such that the employee felt compelled to resign.

Plaintiff testified that the last straw that caused her to resign was her evaluation conducted by Millwood on May 11, 2006, where he wrote a behavioral analysis on her and during the review he made threats that she needed to be more compliant to her supervisors (himself and Farmer). Leading up to May 11, 2006, Farmer was leaning over the Plaintiff, committing some touchings, and complimenting her body, but Farmer was no longer hugging Plaintiff and no longer telling offensive stories. Farmer was also telling B&C people that Plaintiff was not a team player and that she had a bad attitude, which in the light most favorable to Plaintiff, were acts of retaliatory harassment. Although Farmer's conduct caused Plaintiff stress and unhappiness and made her working conditions more difficult, he was not physically threatening Plaintiff or stalking her or putting her in any danger.[6] Moreover, Basden attempted to have a meeting with Plaintiff to discuss Plaintiff and Ridge's August 5, 2005, letter. It appears that Plaintiff decided not to follow through with this meeting because she thought it may not be effective. Plaintiff's failure was unreasonable. The prior hotline call resulted in a formal prompt investigation by B&C and discipline to Farmer. Also, Plaintiff could have called the hotline and/or followed the company policy[7] to report her concerns to the President and CEO if she was uncomfortable meeting with Basden. Under the circumstances,

---

[6] It should be noted that throughout Plaintiff's employment she continued to receive raises, receive year-end bonuses which increased in amount, and by her own testimony receive fair reviews, except for the May 2006 review.

[7] <u>See</u> (Def's Exh. Y).

-40-

although the evidence shows that the Plaintiff's hostile work environment was sufficiently severe and pervasive, Plaintiff's working conditions were not so intolerable that a reasonable person would have felt compelled to resign.  Thus, the court finds that as a matter of law no reasonable juror could conclude that the Plaintiff was constructively discharged, and therefore, that was not a tangible employment action.

As discussed above, the court recommends that summary judgment be denied on Plaintiff's hostile work environment claim because B&C cannot rely on the Ellerth-Faragher affirmative defense due to the existence of a "tangible employment action," the failure to promote.  If the district court finds that there was no "tangible employment action,"in the interest of completeness the court will discuss whether B&C can establish the Ellerth-Faragher affirmative defense as a matter of law.  See Baldwin v. Blue Cross / Blue Shield, 480 F.3d 1287, 1303 (11th Cir. 2007) (employer bears the burden of establishing both elements of the defense).

B&C argues that it exercised reasonable care to prevent and promptly correct Farmer's sexually harassing behavior (first prong).  B&C had instituted a hotline for employee concerns.  B&C had a policy against sexual harassment that was distributed to employees and explained who to contact within the company in case of sexual harassment.  After the hotline call in February 2005 about Farmer, B&C promptly investigated the matter.  B&C did discipline Farmer by giving him a memo of "consensus corrective action counseling" on February 24, 2005 and required him to apologize to the purchasing department.  Farmer received verbal discipline, and coaching and counseling.  Farmer was required to attend sexual harassment training, and Plaintiff was told to report to Berg.  On the other hand, Berg seemed to be the supervisor in name only because Farmer had final control of raises and reviews.  Farmer's sexually harassing conduct soon resumed and he

began several retaliatory actions against Plaintiff and Ridge.  Plaintiff and Ridge met with Basden in person in August 2005 to discuss who their supervisor would be, and Basden stated, "Y'all haven't gotten past this, yet, you can't move on?... maybe if y'all can't get past this, y'all should transfer, maybe look for another job."  After that meeting, Plaintiff and Ridge sent a letter to Basden to further express their concern about Farmer's conduct.  Also, Berg gave a detailed exit interview statement to B&C in August of 2005 where she detailed Farmer's conduct and stated her opinion that Farmer was not properly disciplined.  The court finds that there is a material issue of fact as to whether B&C acted reasonably under the circumstances to correct Farmer's harassing behavior.

B&C argues that the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities that the employer provided or to avoid harm otherwise (second prong).  B&C argues that when Farmer's conduct resumed after the February 2005 investigation plaintiff failed to report his conduct to the proper people in management.  The evidence shows that Plaintiff did report to Basden in August 2005 that Farmer's conduct was continuing.  When Basden tried to meet with Plaintiff in August 2005 to discuss the letter, Plaintiff refused.  Plaintiff did not go to human resources to request a transfer.  She also did not report the situation directly to the President & CEO.  The court finds that Plaintiff unreasonably failed to take advantage of B&C's reporting procedures and failed to seek out a firm offer of a transfer (avoid harm otherwise).

### B. Claims against B&C based upon Title VII Retaliation

Plaintiff brings a claim for retaliation in violation of Title VII.  Title 42, Section 2000e-3(a) of the United States Code provides, in relevant part, as follows:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made

> a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

To establish a prima facie case of retaliation, a plaintiff must show (1) she engaged in protected activity, (2) the employer took adverse employment action against her (including actions that a reasonable employee would have found to be materially adverse in that it might have dissuaded a reasonable worker from making or supporting a charge), and (3) a causal connection existed between the protected activity and the adverse action. Matvia v. Bald Head Island Management, Inc., 259 F.3d 261, 271 (4th Cir. 2001); Burlington Northern & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006). In order to establish the requisite causal connection, plaintiff must proffer evidence which establishes that she would not have been terminated but for her protected activity. Hopkins v. Baltimore Gas & Electric Co., 77 F.3d 745, 755 (4th Cir. 1996). If a plaintiff can show a prima facie case, the burden shifts to the employer to rebut the presumption by proffering a non-retaliatory reason for its action. Baqir v. Principi, 434 F.3d 733, 747 (4th Cir. 2006). If the employer does so, then a plaintiff must show that the employer's proffered reason is pretextual. Id.

### 1. 300-Day Statute of Limitations

Defendants argue that because Plaintiff did not file her EEOC charge until May 18, 2006, all discrete retaliatory acts which occurred before July 22, 2005, are time barred. Plaintiff does not appear to dispute that. Therefore, the court finds that it is undisputed that all discrete retaliatory acts which occurred before July 22, 2005, are not actionable.

### 2. Materially Adverse Actions Against Plaintiff

Both parties appear to agree that when the Plaintiff participated in the February 2005 investigation against Farmer she engaged in protected activity. Defendants argue that the Plaintiff has not presented evidence that after the investigation the Defendants took any materially adverse

-43-

action against the Plaintiff.[8]  Plaintiff asserts the following materially adverse actions that were taken

against the Plaintiff after the investigation: the wrath Plaintiff incurred at work at the hands of

Farmer and Millwood; lower raises, lower evaluations, and reduced bonuses; failure to promote

Plaintiff to purchasing agent; constructive discharge of Plaintiff; and sending Plaintiff home and

disparaging her on May 15, 2006.  In the light most favorable to Plaintiff, the court does not accept

her assertion that Defendants constructively discharged her for the reasons previously discussed.

Also, there is no evidence of reduced bonuses; in fact, her 2005 year end bonus was $3,600 while

her 2004 year end bonus was $3,000.

There is evidence that Plaintiff's July 2005, December 2005, and May 11, 2006, evaluations

were not as positive as they had been the two most recent evaluations prior to the investigation,

December 2004 (3.90) and June 2004 (3.65).  However, the Plaintiff did not object to management

about her scores; she agreed that they were accurate.  In Plaintiff's July 2005 evaluation, her overall

score was 3.3.  Berg had rated Plaintiff's customer service a 5 but Farmer then changed it to 4.

Farmer wrote Plaintiff's year end 2005 evaluation and gave her an overall score of 3.3, which was

lower than her scores immediately prior to the investigation but Plaintiff did not object to the score.

Millwood's review of Plaintiff in May 2006 gave her an overall score of 3.3, which she was not

upset about but it was still lower than the scores prior to the investigation.  Millwood wrote the first

behavioral review on Plaintiff which contained some negative comments.[9]  Plaintiff did object to

---

[8] Defendants do not argue that Farmer acted outside the scope of his employment when he
perpetrated the "materially adverse actions" discussed herein.

[9] In the July 2005 review, Berg wrote a behavioral review of the Plaintiff, but this is not
evidence of retaliation.  After the investigation, Berg had heard Farmer saying that Plaintiff was not
a team player and had a bad attitude.  Therefore, Berg decided to write a behavioral review in order
to protect Plaintiff and in the review Berg stated that Plaintiff's teamwork was exceptional.

Millwood about the behavioral section of the review.  Plaintiff understood the behavioral portion to state that she was weak and easily negatively influenced by others.  During the evaluation, Millwood stated to Plaintiff that she was not compliant, not doing her job, and her future reviews would be horrible if she did not change.

There is evidence that after the investigation Farmer undertook a campaign to discredit Plaintiff's reputation at B&C and to lower her evaluation scores.  During the meeting where Spivey asked Berg to be Plaintiff's supervisor, Berg heard Farmer saying to Spivey that Plaintiff was not a team player and had a bad attitude.  Prior to the May 2006 evaluation, Millwood and Farmer went two or three times to Little in human resources to discuss Plaintiff's behavior of joining together with Ridge to complain.  In other words, Farmer began telling human resources that Plaintiff was a complainer.  After the investigation, Farmer labeled the Plaintiff as a complainer to Millwood, who reported to Farmer.  Millwood, however, testified that Plaintiff nor Ridge ever complained to him. The only evidence of Plaintiff's complaining is about Farmer's unwelcome conduct and which supervisor she wanted to report to.  Therefore, Farmer and Millwood's actions of unjustifiably labeling Plaintiff as a complainer and Millwood's reflecting that opinion on her behavioral review was a materially adverse action taken against her.[10]

When a purchasing agent position came open, Farmer told Plaintiff in March or April of 2006 that she would get the job, that she had already been doing the job duties well, and that he would get the paperwork together.  Plaintiff made it clear that she desired that job.  However, Farmer hired

---

[10] It should be noted, as set forth above, a plaintiff's standard for showing an employer's action was materially adverse is a lesser burden than proving that the action was related to the terms or conditions of employment which is the standard for certain Title VII claims. Burlington Northern & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006).

Denise Schwenz in May 2006 as the purchasing agent, and Plaintiff was told that she had not timely applied for the job. There is evidence that sometimes at B&C job openings were not posted on the intranet web site. For example, it appears that Plaintiff was promoted from purchasing assistant to purchasing associate without having to formally apply. Also, Ridge was promoted by Farmer to purchasing associate without having to formally apply, and Ridge does not believe that the job position was posted on B&C's intranet. Because Farmer had told the Plaintiff that she would get the job, it was reasonable for her to expect that she would not need to formally apply. The court finds that Plaintiff's not being hired as the purchasing agent is evidence of a materially adverse action.

On Monday, May 15, 2006, the first business day after her resignation, Defendants gave Plaintiff a box and asked her to leave immediately even though no one saw her doing anything disruptive.[11] Millwood believed that it was in B&C's best interest for Plaintiff and Ridge to leave immediately because people were speculating about the reasons they resigned and Millwood felt that people could not focus on work. The evidence shows that at B&C after an employee resigns some employees are permitted to work two weeks, some are given luncheons, and some are asked to leave immediately. In fact, when the Plaintiff had left human resources prior to beginning with the purchasing department she was not allowed to work her two weeks notice. B&C's asking Plaintiff and Ridge to leave immediately is not evidence of a materially adverse action.

Plaintiff argues that Millwood's treatment of her from January 2006 until her last day was a materially adverse action. The evidence shows that he was belligerent and rude to Plaintiff, but

---

[11] Plaintiff may be claiming another "materially adverse action" – that B&C disparaged her reputation as a "disgruntled" employee who did not handle her business affairs appropriately. To the extent Plaintiff makes this claim, the court finds that B&C's conduct does not qualify as a materially adverse action taken against the Plaintiff during her employment. When this conduct occurred, Plaintiff was no longer employed.

also that he acted that way to Scales.  Millwood may have piled work upon the Plaintiff but the entire department was very busy while Ridge was on maternity leave.  The court finds that Millwood's general behavior toward the Plaintiff was not a materially adverse action, except to the extent that he joined together with Farmer to label Plaintiff a complainer and reflect that in her evaluation.

### 3. Causal Connection

Defendants argue that Plaintiff has not presented any evidence that their conduct, even if it was a materially adverse action, was causally connected to Plaintiff's protected activity.  Defendants argue that a substantial amount of time lapsed between the February 2005 protected activity and any of the alleged retaliatory conduct.  They point to several cases which find that a lapse of three and four months was insufficient to establish a causal connection based on temporal proximity.  Plaintiff argues that the time frame could hardly be closer.  The court finds that the conduct which qualifies as materially adverse actions began very soon after the conclusion of the February 2005 investigation – during the meeting where Farmer told Spivey that Plaintiff had a bad attitude and was not a team player.  The materially adverse conduct continued until March or April 2006 (failure to promote Plaintiff to purchasing agent).  Even if there was a gap in time between the protected activity and the materially adverse actions, Farmer's stating to Plaintiff "I can't fire you now because of this sexual harassment thing," shows that Farmer knew to be careful about retaliating so he may have waited for an opportunity to arise.  The Plaintiff has presented evidence of a causal connection between the protected activity and the materially adverse action.

### 4. Employer's Proffered Non-Retaliatory Reason

If a plaintiff can show a prima facie case, the burden shifts to the employer to rebut the presumption by proffering a non-retaliatory reason for its action.  Baqir v. Principi, 434 F.3d 733,

747 (4th Cir. 2006). Defendants argue that their actions were justified by legitimate, non-retaliatory reasons. Because the court finds that only certain actions can establish Plaintiff's prima facie case, it will only discuss the Defendants' proffered reasons for those particular actions. First, there is no specific non-retaliatory reason given as to why Farmer began telling human resources, Spivey, Berg, and Millwood that Plaintiff was a complainer, had a bad attitude, and was not a team player. Defendant does assert that the reason that Millwood conducted the additional behavioral review of Plaintiff in May 2006 was that Millwood did a behavioral review on all of his employees in May of 2006. Defendants further assert that the overall score given to Plaintiff and Ridge by Millwood was in the top 5% of scores he had given during his twelve years with B&C during reviews of 700 or 800 people. Millwood's testimony establishes a non-retaliatory reason for his action but not for Farmer's actions. Second, Defendants assert that Farmer hired Denise Schwenz in May 2006 as the purchasing agent because she was qualified and applied within the time frame. That reason is non-retaliatory and is supported by the record.

After a defendant satisfies its burden of production of a non-retaliatory reason, the burden shifts back to a plaintiff to produce evidence that the defendant's reason is not its true reason, but is pretext for a retaliatory reason. It is a plaintiff's burden ultimately to show that retaliation for protected activity was the motivating factor in the adverse employment actions. It is not necessary to decide "whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination (or adverse employment action)."[12] Hawkins v. Pepsico, 203

---

[12] "Proof that the employer's proffered reasons are unpersuasive, or even obviously contrived, . . . does not necessarily establish that [plaintiff's] proffered reason (race discrimination) . . . is correct." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 146-47 (2000). "It is not enough to disbelieve the [employer]." Love-Lane v. Martin, 355 F.3d 766, 788 (4th Cir. 2004). Plaintiff must show a reasonable jury could "believe [her] explanation of intentional race

F.3d 274, 279 (4th Cir. 2000) (quoting <u>DeJarnette v. Corning, Inc.</u>, 133 F.3d 293, 299(4th Cir. 1998));

<u>DeJarnette</u>, 133 F.3d at 299 ("[T]his Court does not sit as a kind of super-personnel department

weighing the prudence of employment decisions made by firms charged with employment

discrimination ...." (internal quotation marks omitted)); <u>Henson v. Liggett Group, Inc.</u>, 61 F.3d 270,

277 (4th Cir.1995) ("We have recognized the importance of giving an employer the latitude and

autonomy to make business decisions, including workplace reorganization, as long as the employer

does not violate the ADEA."); <u>Jiminez v. Mary Washington College</u>, 57 F.3d 369, 377 (4th

Cir.1995) ("Title VII is not a vehicle for substituting the judgment of a court for that of the

employer").

     Plaintiff argues that the following shows pretext, and the court finds that there is evidence

in the record to establish: Plaintiff reliably did her job and did it well; there is no evidence that she

was a whiner or complainer except with regard to objecting to Farmer's unwelcome conduct; it can

be reasonably inferred from the facts that Millwood wrote the negative behavioral analysis about

Plaintiff because Farmer was Millwood's supervisor and Farmer wanted him to write that section

and had gone to HR with Millwood to discuss how to write the behavioral; Farmer told Plaintiff

directly and indicated to the department that Plaintiff would get the purchasing agent job; and

Plaintiff had been performing the job duties of the purchasing agent and Scales had trained her on

some of those duties.  The court finds that a reasonable juror could conclude <u>the</u> motivating factor

for Plaintiff's negative behavioral review, Farmer's campaign to label Plaintiff as a complainer or

not a team player, and Plaintiff's failure to be promoted to the purchasing agent position was because

---

discrimination." <u>Id</u>.

she had willingly participated in the investigation of Farmer's sexual harassment.  Accordingly, the court recommends that the motion for summary judgment be denied on the retaliation claim.

### C. Title VII Damages and Plaintiff's Duty to Mitigate

Defendants move for summary judgment on certain damages that could stem from a Title VII case -- back-pay, front-pay and employment benefits – because Plaintiff did not fulfill her statutory duty to seek "substantially similar" employment.  "In the case of a Title VII claimant who has been unlawfully discharged, the duty to mitigate damages requires that the claimant be reasonably diligent in seeking and accepting new employment substantially equivalent to that from which he was discharged."  Brady v. Thurston Motor Lines, Inc., 753 F.2d 1269, 1273 (4th Cir. 1985).  If a claimant undertakes similar employment and then voluntarily quits back pay should be decreased by the amount he would have earned had he not quit.  Id.  Defendants argue that as a matter of law Plaintiff and Ridge failed to mitigate damages because their cleaning business only keeps them busy part-time.  Plaintiffs respond that they have put much effort into their business and desire to grow it into a full-time business and if the business does not grow they will seek full-time employment elsewhere.  Plaintiff relies on the proposition that the "decision to become self-employed, alone, does not indicate a lack of reasonable diligence."  Id. at 1468.  The court believes that because of its recommendation above that as a matter of law the Plaintiff was not constructively discharged by B&C and rather she voluntarily quit, she cannot as a matter of law recover back-pay, front-pay, and employment benefits.  In other words, Plaintiff was paid in full for her work, and B&C does not owe her any monetary damages related to wages or benefits that she could have earned.  Cf. Martin v. Cavalier Hotel Corp., 48 F.3d 1343, 1358 (4th Cir. 1995) (noting that if a constructive discharge is

proved, back pay is usually awarded by the judge as a matter of course).  The Plaintiff, of course,

may seek to recover other damages available pursuant to Title VII.

### D. State Law Claims

Defendants move for summary judgment on each of the Defendants' state law claims.

#### 1. Negligence against B&C

Defendant B&C argues that the claims against it for negligence and negligent retention or

supervision should be dismissed because they are barred by the South Carolina Worker's

Compensation Act.  The statute provides:

> The rights and remedies granted by this Title to an employee when he and his
> employer have accepted the provisions of this Title, respectively, to pay and accept
> compensation on account of personal injury or death by accident, shall exclude all
> other rights and remedies of such employee ... against his employer, at common law
> or otherwise, on account of such injury, loss of service or death.

S.C. Code Ann. § 42-1-540.  The exclusivity provision of the Act precludes an employee from

bringing a tort action against his employer for a work-related injury.  Edens v. Bellini, 597 S.E.2d

863 (S.C. Ct. App. 2004).  The exceptions to the exclusivity provisions are: ... "(2) where the injury

is not accidental but rather results from the intentional act of the employer or its alter ego; (3) where

the tort is slander and the injury is to reputation...." Id.

Plaintiff asserts that she only seeks damages of a non-personal injury nature for her loss of

employment and injury to dignity.  Because the South Carolina courts have broadly interpreted the

exclusivity provision, the court finds that Plaintiff's claims for negligence and negligent retention

or supervision should be barred by the exclusivity provision of the Act.

#### 2. Outrage against Farmer

Defendant Farmer moves for summary judgment on the Plaintiff's claim for intentional infliction of emotional distress or outrage. To survive a motion for summary judgment a plaintiff must present evidence of these factors:

> 1) the defendant intentionally or recklessly inflicted severe emotional distress, or was certain, or substantially certain, that such distress would result from his conduct; (2) the conduct was so "extreme and outrageous" so as to exceed "all possible bounds of decency" and must be regarded as "atrocious, and utterly intolerable in a civilized community;" (3) the actions of the defendant caused plaintiff's emotional distress; and (4) the emotional distress suffered by the plaintiff was "severe" such that "no reasonable man could be expected to endure it."

Hansson v. Scalise Builders, 650 S.E.2d 68, 70 (S.C. 2007). Defendant argues that there is no evidence that Plaintiff's mental anguish was severe. The court should play a gate-keeping role to ensure that this tort does not become a "panacea for wounded feelings" and a plaintiff must present third party witness testimony and other corroborating evidence that the plaintiff had "severe" emotional distress. Id. Plaintiff testified that she had knots in her stomach every day and did become ill due to Farmer's conduct. The corroborating evidence is that Scales saw Plaintiff in tears on one occasion after Farmer had touched her and Ridge saw Plaintiff take Pepto Bismol at work and saw her cry on more than one occasion due to Farmer's conduct. The Plaintiff did not go to counseling and did not miss work because of Farmer's conduct. The court believes that as a matter of law there is insufficient evidence to establish that Plaintiff's emotional distress was severe. Accordingly, Defendant Farmer should be granted summary judgment on this claim.

### 3. Intentional Interference With Contract against Farmer

Defendant Farmer also moves for summary judgment on the claim for intentional interference with contract. Farmer argues that because Plaintiff voluntarily resigned (and was not constructively discharged) there was no breach of the employment at-will contract. Farmer also argues that he

cannot be a third party who interfered with Plaintiff's at-will contract with B&C because he was an agent of B&C. Plaintiff agrees that agents of employers are not third parties to the employer's contracts. Plaintiff urges the court to resolve this claim at trial depending on whether Farmer acted within or outside the scope of his employment.

In South Carolina, the elements of a cause of action for tortious interference with a contract are: "(1) existence of a valid contract; (2) the wrongdoer's knowledge thereof; (3) his intentional procurement of its breach; (4) the absence of justification; and (5) resulting damages." Camp v. Springs Mortg. Corp., 426 S.E.2d 304, 305 (S.C. 1993). The court finds that because as a matter of law the Plaintiff was not constructively discharged and that she voluntarily quit, as discussed above, then this claim should fail. As a matter of law, no contract was breached; the Plaintiff resigned. Therefore, summary judgment should be granted on this claim.

### 4. Assault and Battery against Farmer

Defendant Farmer moves for summary judgment on the assault and battery claims because they are barred by the exclusivity of the Worker's Compensation Act and because Plaintiff gave implied consent or was comparatively negligent. The court finds that Plaintiff can bring a tort action against Farmer individually for assault and battery; the Act does not preclude that. Also, comparative negligence is not a defense to an intentional tort and there is no evidence of implied consent. Accordingly, Farmer's motion for summary judgment should be denied as to the assault and battery claims.

### 5. Defamation against both Defendants

Both Defendants move for summary judgment on Plaintiff's claims of defamation. A plaintiff can recover for defamation for injury to her reputation as the result of the defendant's

-53-

communication to others of a false message about the plaintiff.  Holtzscheiter v. Thomson Newspapers, Inc., 506 S.E.2d 497, 508 (S.C. 1998).  In South Carolina, slander is actionable per se if it charges Plaintiff with one of five acts or characteristics: "(1) commission of a crime of moral turpitude; (2) contraction of a loathsome disease; (3) adultery; (4) unchastity; or (5) unfitness in one's business or profession."  Id. at 511.  The elements a plaintiff must prove are: a false and defamatory statement was made; the unprivileged statement was published to a third party; the publisher was at fault; and either the statement was actionable irrespective of harm or the publication of the statement caused special harm.  Fleming v. Rose, 567 S.E.2d 857, 494 (S.C. 2002).

The Plaintiff appears to allege that two separate incidents constituted defamation.  First, Farmer (and possibly senior management) called Plaintiff and Ridge "dumb blond bimbos" and said that Plaintiff and Ridge "looked stupid together."  There is evidence that Farmer told Plaintiff and Ridge that people at B&C were making these comments.  Scales and Berg testified that they heard Farmer make the "dumb blonde bimbo" comment about Plaintiff and Ridge.  Plaintiff testified that after she and Ridge complained to Spivey about the comments in June 2003 Farmer never used that term again.  The statute of limitations for defamation is two years,[13] and there is no evidence that the comment was made after June 2003.  Thus, the Plaintiff's complaint filed on May 31, 2006, was untimely to raise defamation based upon the "dumb blond bimbo" comment, and the defendants should be granted summary judgment on that claim for defamation.

Second, Plaintiff argues that Doug Wendel's speech to the fourth floor employees at B&C on May 15, 2006, was defamation because Wendel stated that Plaintiff and Ridge were "disgruntled," "were not conducting their business affairs in an appropriate manner," and that B&C

---

[13] See S.C. Code Ann. § 15-3-550 (1976).

supported Farmer one hundred percent.  Wendel was the CEO of B&C, and Wendel obtained his information from Spivey.  Spivey obtained his information from Basden who obtained her information from Millwood and Little.  No one testified that Plaintiff and Ridge were acting "disgruntled" or that they had not conducted their business affairs in an appropriate manner.  Thus, Plaintiff argues that the statements were not true.  B&C argues that as a matter of law a qualified privilege existed to make those statements because Wendel acted within the scope of his CEO duties by calling a meeting of employees who worked on the same floor with Plaintiff in order to put rumors to rest and get everyone back to work.  "A communication made in good faith on any subject matter in which the person communicating has an interest or duty is qualifiedly privileged if made to a person with a corresponding interest or duty even though it contains matter which, without this privilege, would be actionable."  Constant v. Spartanburg Steel Products, Inc., 447 S.E.2d 194, 196 (S.C. 1994).  "The publisher must not wander beyond the scope of the occasion."  Id.  "One publishing under a qualified privilege is liable upon the proof of actual malice.  Actual malice can mean the defendant acted recklessly or wantonly, or with conscious disregard of the plaintiff's rights. It is ordinarily for the jury to determine whether the privilege has been abused or exceeded."  Id.

The court finds that Wendel's statements made to fourth floor employees are entitled to a qualified privilege as a matter of law.  Even if they were not accurate or true statements, Wendel made them in good faith based upon information he received from his subordinate.  There is no evidence in the record to support that Wendel acted with actual malice.  Accordingly, summary judgment should be granted to B&C on the second alleged defamation claim.

## V.     CONCLUSION

In light of the above analysis, it is recommended that Defendant B&C and Farmer's Motions for Summary Judgment (Document # 70) be granted in part and denied in part as set forth above.


|                              | s/Thomas E. Rogers, III          |
|------------------------------|----------------------------------|
| August 11, 2008              | Thomas E. Rogers, III            |
| Florence, South Carolina     | United States Magistrate Judge   |

**The parties' attention is directed to the important notice contained on the following page.**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Court Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. In the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must "only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation."  *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005).

Specific written objections must be filed within ten (10) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  The time calculation of this ten-day period excludes weekends and holidays and provides for an additional three (3) days for filing by mail.  Fed. R. Civ. P. 6(a) & (e).  Filing by mail pursuant to Fed. R. Civ. P. 5 may be accomplished by mailing objections to:

Larry W. Propes, Clerk

United States District Court

P. O. Box 2317

Florence, South Carolina 29503

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985).